1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM DAVID BITLER, JR.,              No. 1:18-cv-01062-GSA

12                  Plaintiff,

13        v.                                 **ORDER DIRECTING ENTRY OF**
                                             **JUDGMENT IN FAVOR OF**
14   ANDREW SAUL, Commissioner of Social     **COMMISSIONER OF SOCIAL SECURITY**
     Security,                               **AND AGAINST PLAINTIFF**
15

16                  Defendant.

17

18        **I.        Introduction**

19
          Plaintiff William David Bitler, Jr., ("Plaintiff") seeks judicial review of the final decision
20
     of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his
21
     application for disability insurance benefits pursuant to Title II of the Social Security Act.  The
22
     matter is currently before the Court on the parties' briefs which were submitted without oral
23
     argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15 and
24
     16.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported
25
     by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.
26
     ///
27

28
     ---
     [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 6 and 7.

## II. Procedural Background

On November 24, 2013, Plaintiff filed an application for disability insurance benefits alleging disability beginning October 18, 2012.  AR 25.  The Commissioner denied the application initially on March 11, 2014, and again following reconsideration on August 1, 2014.  AR 25.

On September 22, 2014, Plaintiff filed a request for a hearing.  AR 25.  Administrative Law Judge Timothy S. Snelling presided over an administrative hearing on October 5, 2016.  AR 42-88.  Plaintiff appeared and was represented by an attorney.  AR 42.  On November 30, 2016, the ALJ denied Plaintiff's application.  AR 25-36.

The Appeals Council denied review on November 21, 2017.  AR 9-12.  On August 8, 2018,  Plaintiff filed a complaint in this Court.  Doc. 1.

## III. Factual Background

Plaintiff (born April 1974) sought disability benefits alleging fibromyalgia, chronic headache, irritable bowel syndrome, myositis, cervical and thoracic radiculitis, late effect of intracranial injury without skull fracture, displacement of lumbar intervertebral disc with myelopathy, major depressive disorder, neck disorder and vertigo.  AR 113.

Plaintiff completed high school and attended a year of college.  AR 47.  He previously worked as a waiter, busboy, machine operator and general laborer.  AR 48.  Plaintiff testified that difficulties with social interactions and chronic headaches interfered with all of his prior jobs.  AR 48-49.

On  May 19, 2009, Plaintiff's primary care physician, Jessica S. Craig, M.D., referred Plaintiff to chiropractor Richard S. Garabedian, D.C.  AR 499.  Dr. Garabedian, who treated Plaintiff from June 13, 2009 through October 19, 2012,[2] issued numerous prescriptions directing Plaintiff to remain off work.  AR 427-31, 433-34, 436-98.

Lumbar spine x-rays in May 2010 were unremarkable.  AR 388.

In November 2010 and July 2011, Dr. Craig, M.D. completed doctor's certificates for disability benefits.  AR 382-83.  In each certificate, Dr. Craig stated that Plaintiff had severe

---

[2] Dr. Garabedian's treatment notes, which the Court finds illegible, are included in the record at AR 504-22.

persistent headache, cervical and thoracic radiculitis, fibromyalgia and irritable bowel syndrome. AR 382-83.

An MRI of Plaintiff's lumbar spine in July 2010 revealed a slight disc bilge at L4-5, but no canal or foraminal stenosis or nerve root impingement. AR 386.

In October 2010, Jonathan Grossman, M.D., a specialist in physical medicine and rehabilitation, examined Plaintiff in a consultation requested by neurosurgeon Henry Aryan to evaluate Plaintiff's severe cervical pain and consider treatment for fibromyalgia.[3] AR 389-90. The examination was within normal limits. AR 389. Except for severe restriction of lateral bending, Plaintiff's range of motion was painful but only mildly restricted. AR 389-90. Strength was normal. AR 390. Dr. Grossman summarized:

> [T]he patient presents with widespread multifactorial pain. He does have cervical facet joint pain and dysfunction on exam, and this is consistent with his history of neck pain and dysfu[nc]tion. This is in addition to some chronic myofascial spasm and related pain. He has Chronic Daily Headaches secondary to the cervical musculo-ligamentous strain. He may have fibromyalgia, but this has not been confirmed by diagnosis yet. No cervical radiculopathy on exam.

AR 390.

X-rays of Plaintiff's hip, administered in May 2011, were normal. AR 549.

Neurologist, Ernestina Saxton, M.D., Ph.D., saw Plaintiff in November 2012 and issued her consultation report on December 31, 2012. AR 587-89. Plaintiff complained of headaches with multiple types of pain accompanied by photophobia, dizziness, nausea and vomiting. AR 587. In the past, Plaintiff received chronic opioids which enabled him to function. AR 587. He had missed a lot of work and had not worked at all since October 18, 2012. AR 587. He had

///
///
///
///
///
///

---

[3] Dr. Aryan's treatment records are not included in the administrative record.

previously been treated with Depakote,[4] Lamictal,[5] Cymbalta,[6] Lyrica,[7] Topamax[8] and Neurontin[9] without significant effect. AR 587. His current medications were Hydrocodone/Acetaminophen,[10] Dicyclomine,[11] Sucralfate,[12] Fluoxetine[13] and Baclofen.[14] AR 588. Plaintiff also used marijuana, which relieved pain and helped with nausea and vomiting. AR 588.

On examination, Dr. Saxton noted marked cervical paraspinous muscle spasm and a decreased range of neck motion with tenderness to deep palpation. AR 588. He was slow to answer questions and may have demonstrated word-finding problems. AR 588. He was depressed. AR 588. Otherwise, the examination was unremarkable. AR 588-89.

Dr. Saxton ordered MRI studies of Plaintiff's skull and cervical spine, and prescribed Lamictal, which was eventually to be supplemented with nortriptyline.[15] AR 589. She referred Plaintiff to Dr. Bauer for neuropsychologic testing to assess cognitive function and moods. AR 589.

///

---

[4] Depakote (Valproic acid) is an anticonvulsant prescribed, among other reasons, to prevent migraine headaches but not to relieve headaches that have already begun. Medlineplus.gov/druginfo/meds/a682412.html (accessed February 24, 2020).

[5] Lamictal (Lamotrigine) is an anticonvulsant prescribed to treat seizures and abnormal moods. Medlineplus.gov/druginfo/meds/a695007.html (accessed February 24, 2020).

[6] Cymbalta (Duloxetine) is prescribed to treat depression, anxiety and certain types of pain. Medlineplus.gov/druginfo/meds/a604030.html (accessed February 24, 2020).

[7] Lyrica (Pregabalin) is an anticonvulsant prescribed to treat postherpetic pain, neuropathic pain and fibromyalgia. Medlineplus.gov/druginfo/meds/a605045.html (accessed February 24, 2020).

[8] Topamax (Topiramate) is an anticonvulsant prescribed to treat seizures and migraine headaches. Medlineplus.gov/druginfo/meds/a697012.html (accessed February 24, 2020).

[9] Neurontin (Gabapentin) is an anticonvulsant prescribed to treat seizures and postherpetic neuralgia. Medlineplus.gov/druginfo/meds/a694007.html (accessed February 24, 2020).

[10] Hydrocodone/acetaminophen is an opiate drug prescribed to relieve moderate to severe pain. Medlineplus.gov/druginfo/meds/a601006.html (accessed February 24, 2020).

[11] Dicyclomine is an anticholinergic drug prescribed to treat irritable bowel syndrome. Medlineplus.gov/druginfo/meds/a684007.html (accessed February 24, 2020).

[12] Sucralfate is a protectant drug prescribed to treat and prevent the return of duodenal ulcers. Medlineplus.gov/druginfo/meds/a681049.html (accessed February 24, 2020).

[13] Fluoxetine (Prozac) is prescribed to treat depression, obsessive-compulsive disorder, eating disorders and panic attacks. Medlineplus.gov/druginfo/meds/a689006.html (accessed February 24, 2020).

[14] Baclofen is a skeletal muscle relaxant prescribed to treat pain and certain types of spasticity from multiple sclerosis, spinal cord injuries and other spinal cord diseases. Medlineplus.gov/druginfo/meds/a682530.html (accessed February 24, 2020).

[15] Nortriptyline is a tricyclic antidepressant. Medlineplus.gov/druginfo/meds/a682620.html (accessed February 24, 2020).

Dr. Bauer conducted the neuropsychological evaluation in March 2013. AR 581-86. Plaintiff was not then taking the Lamictal, Baclofen or nortriptyline due to lack of funds. AR 581. Plaintiff reported that although he had experienced headaches before 2009, in that year he began experiencing generalized pain, stomach problems, and back and neck pain. AR 582. The new symptoms began shortly after Plaintiff experienced severe stressors including his mother's cancer diagnosis and the end of his marriage. AR 582. Plaintiff began missing many days of work. AR 582. In 2012, when he was warned that his job was in jeopardy due to his frequent absences, Plaintiff "went on disability." AR 582. At the time of the evaluation, Plaintiff was in bankruptcy and faced likely eviction from his home. AR 582.

Dr. Bauer administered multiple neuropsychological tests which indicated processing disruptions characterized by significant difficulty in sustaining attention and significantly slowed reaction time. AR 585. Plaintiff also demonstrated significant difficulty in visual and verbal memory and cognitive flexibility/problem solving. AR 585. Dr. Bauer diagnosed (1) a late effect of intracranial injury without mention of skull fracture, and (2) depressive disorder not otherwise specified. AR 585.

Dr. Bauer recommended that Plaintiff use software-based cognitive remediation programs, but acknowledged that Plaintiff probably did not then have the resources to pay for such programs. AR 586. The doctor also recommended a psychiatric evaluation for a psycho-diagnostics clarification and medication consultation; cognitive behavioral therapy with a psychologist; and, continued treatment with Dr. Saxton for headache pain.. AR 586.

The MRI study of Plaintiff's cervical spine in October 2013 revealed a linear enhancement at C6. AR 668. No definitive vascular malformation was apparent and the radiologist suggested that the enhancement indicated slow flow within the venous epidural structure. AR 668. However, the radiologist could not rule out vascular malformation. AR 668.

Dr. Saxton continued to treat Plaintiff's headaches. In September 2013, Plaintiff reported that Lamictal was reducing his headache pain. AR 577-78.

In October 2013, James Wiggins, D.O., conducted Plaintiff's annual health examination. AR69-71. Plaintiff was congested and had a sore throat, malaise/fatigue, myalgias and joint pain.

AR 569.  Plaintiff told Dr. Wiggins that he had previously been diagnosed with fibromyalgia.  AR 569.  Although Plaintiff complained of diffuse joint tenderness, the examination revealed a normal range of motion and no edema.  AR 569.  Neurological assessment revealed normal reflexes and no cranial nerve deficit.  AR 570.  Dr. Wiggins prescribed nasal spray and ordered an arthritis panel in the lab work.  AR 570.

When Plaintiff saw Dr. Saxton in February 2014, Plaintiff had not yet had a neurosurgical consultation due to an upper respiratory infection.  AR 629.  In May 2014, Plaintiff complained of weakness in his extremities and increased difficulty climbing stairs.  AR 625.  Dr. Saxton noted that Plaintiff still had not had a neurosurgical consultation to examine the spinal vascular lesions.  AR 625.

MRI studies of Plaintiff's cervical and thoracic spine in August 2014 were unremarkable.  AR 656, 658.  The linear enhancement was no longer visible in the study of the cervical spine.  AR 656.  Nonetheless, in March 2016, Dr. Saxton's notes continued to refer to a vascular lesion of the spinal cord.  AR 670.

### IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

///

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

///

///

7

## VI.    Summary of the ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 18, 2012.  AR 27.  His severe impairments included: a history of antral gastritis; a history of irritable bowel syndrome; a history of small hiatal hernia; a history of intracranial injury versus traumatic brain injury; chronic pain variously identified as myofascial pain syndrome and fibromyalgia; myositis; persistent post-traumatic migraine headaches; degenerative disc disease and myelopathy of the lumbar spine; mild cognitive disorder not otherwise specified; brief psychotic disorder; pain disorder with psychological factors and general medical condition; anxiety disorder not otherwise specified; and, depression versus major depressive disorder.  AR 27.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  AR 28.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a wide range of medium work.  AR 30.  Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, and could sit, stand and walk six hours in an eight-hour workday.  AR 36. He could occasionally stoop, crouch, crawl, and climb ramps or stairs.  AR 30.  Plaintiff could not climb ladders, ropes or scaffolds.  AR 30.  He must avoid concentrated exposure to loud noises, bright lights and hazardous work conditions.  AR 30.  He required the freedom to wear earplugs. AR 30.  Plaintiff could tolerate occasional face-to-face contact with the general public, supervisors and co-workers (1/3 of the work day with each group).  AR 30.  Plaintiff could not understand, remember and carry out complex and detailed job instructions; make judgments on complex and detailed work related job assignments; or, cope with the stress normally associated with semiskilled or skilled employment.  AR 30.

Plaintiff was able to perform his past relevant work as a canning machine tender.  AR 35. Accordingly, the ALJ found that Plaintiff was not disabled at any time from October 18, 2012, the alleged onset date, through November 30, 2016, the date of the decision.  AR 36.

///

///

**VII.    Sufficient Evidence Supported the ALJ's Determination**

Plaintiff contends that the determination of Plaintiff's residual functional capacity was not supported by sufficient evidence and that the ALJ erred in failing to adopt the opinions of Dr. Saxton, his "longstanding treating provider."  The Commissioner disagrees, contending that the medical opinions as a whole, including the opinions of Dr. Saxton, supported the ALJ's evaluation of the medical evidence.  The Court agrees with the Commissioner.

**A.    Medical Opinions**

**1    Consultative Examination: Psychology**

On February 11, 2014, psychologist Paul Martin, Ph.D., prepared  a consultative evaluation on behalf of the state agency.  Martin reviewed Dr. Bauer's neuropsychological evaluation dated March 13, 2013, secured background information and administered intelligence and memory tests.  AR 606-610.  Dr. Martin opined:

> The claimant had no difficulty understanding, remembering, and carrying out simple instructions.  The claimant had mild difficulty with detailed and complex instructions.  The claimant had mild difficulty sustaining attention and concentration for the duration of the evaluation.  The claimant's pace was mildly decreased.  The claimant demonstrated moderate difficulty with pace and persistence.  The claimant had mild difficulty enduring the stress of the interview.  The claimant is likely to have moderate difficulty adapting to changes in routine work related settings.  Based upon observations of current behavior and reported psychiatric history, the claimant's ability to interact with the public, supervisors and coworkers appears to have mild impairment.

AR 609.

**2.    Consultative Examination: Internal Medicine**

On March 5, 2014, internist Samuel B. Rush, M.D., examined Plaintiff and prepared a consultative opinion.  AR 614-18.  Before examining Plaintiff, Dr. Rush reviewed a three-year-old MRI scan showing a slight disc bulge but no canal or neural stenosis, no spinal stenosis and no nerve root impingement or other significant abnormalities.  AR 614.  The doctor also reviewed a psychological report indicating post-traumatic brain problems and prior depression.  AR 614.

///

///

The physical examination was generally normal. AR 615-16. Musculoskeletal ranges of motion were all within normal limits. AR 616-17. Neurological assessments were also normal. AR 617. Dr. Rush diagnosed:

1. Chronic pain syndrome with diagnoses of fibromyalgia and neck and back problems. However, MRI of his back does not show any significant abnormalities and his range of motion of his back is 100% with negative straight leg raising test and walks normally.
2. Posttraumatic headaches with normal mental status. Today, he did not appear to be depressed and answer[ed] questions appropriately.
3. History of depression, on antidepressants.
4. Gastritis, chronic on medications. Weight has been stable and no bleeding.

AR 617.

Dr. Rush opined that claimant had no restrictions of pushing, pulling, lifting, carrying, walking, standing, sitting, or fine or gross manipulation. AR 618. Plaintiff had no postural or agility restrictions. AR 618. Plaintiff's vision and hearing were not restricted. AR 618.

3. **Agency Physicians**

On the initial review completed March 6, 2014, P. Davis, Psy.D., opined that Plaintiff's mental health condition was not severe. AR 121. P. Frye, M.D., noted that recent prescription of Lamictal had significantly relieved Plaintiff's chronic headaches. AR 121. Examinations were inconsistent regarding allegations of fibromyalgia. AR 121. There was no evidence of cervical or lumbar radiculitis, and the consultative examiner's examination was totally negative. AR 121. Because of reports of occasional vertigo, however, seizure precautions applied. AR 121. Plaintiff was able to perform his past relevant work as a waiter. AR 124-25. However, Plaintiff's inability to work around unprotected machinery precluded his performing his most recent prior work as a machine tender. AR 121.

On reconsideration, psychiatrist K.J. Loomis, D.O., agreed with Dr. Davis's assessment. AR 136. Roy C. Brown, M.D., a specialist in occupational medicine, agreed with Dr. Frye's opinion that Plaintiff could perform his past relevant work, subject to seizure precautions. AR 140.

///

///

10

### 4.     Medical Source Statement: Dr. Saxton

Plaintiff's treating neurologist, Ernestina Saxton, M.D., Ph.D., completed a medical source statement on May 8, 2014. AR 678-81. Dr. Saxton had treated Plaintiff since November 30, 2012 (approximately eighteen months). AR 678. She diagnosed (1) migraine with aura, intractable, chronic; (2) post-traumatic [*sic*]; (3) history of traumatic brain injury, recurrent since age 2; (4) post-concussion syndrome, chronic; (5) depressive disorder; (6) diffuse myofascial/musculoskeletal pain; and, (7) probable AVM spinal cord. AR 678. Plaintiff's symptoms included (1) headache with nausea, vomiting, vertigo and light and sound sensitivity; (2) TMJ jaw; and, (3) diffuse muscle soreness. AR 678. Clinical findings of physical ailments included craniotomy, neck muscle spasms, tenderness with range of motion and multiple tender spots above and below waist. AR 678. Objective signs of mental status included slowing of response, word finding difficulty and depressed mood. AR 678. Plaintiff's medications caused fatigue. AR 678. He had memory lapses. AR 680.

In Dr. Saxton's opinion, Plaintiff could rarely lift five pounds or less and never lift anything heavier. AR 678. Plaintiff could not walk one city block or more without rest or severe pain, could not walk one block or more on rough or uneven ground, nor climb steps without using a handrail. AR 679. He had difficulties with balance, stooping, crouching and bending. AR 679. In an eight hour work day, Plaintiff could sit for about two hours and stand and walk about one hour. AR 679. Plaintiff needed to lie down for four hours in an eight-hour work day because of pain, fatigue, dizziness/vertigo, headache and myofascial pain. AR 679. Plaintiff's legs must be elevated about two hours in an eight-hour work day. AR 680. He would need unscheduled fifteen-minute breaks hourly. AR 679. Plaintiff did not require an assistive device to walk. AR 680.

Bilaterally, Plaintiff could grasp, turn and twist objects and reach overhead about ten percent of the work day. AR 680. He could perform fine manipulations about 60 percent of the work day. AR 680. Plaintiff could climb stairs and ramps but not ladders, ropes or scaffolds. AR 680. Plaintiff must avoid temperature extremes, wetness, humidity, noise, dust and fumes. AR 680.

Plaintiff's pain would constantly interrupt the attention and concentration needed to perform simple tasks. AR 680. Stress would frequently interrupt attention and concentration. AR 680. Plaintiff would likely be off task more than thirty per cent of the work day. AR 681. He was likely to miss five work days per month. AR 681.

### B. Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating

professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

### C. The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

In the course of his assessment of the medical opinions, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 34. The ALJ explained:

> While I find the claimant's description of pain and cognitive difficulties is not totally at odds with the objective record, the undersigned concludes that these symptoms do not preclude the claimant from performing jobs available in the economy. The undersigned has accommodated these symptoms in the residual functional capacity above. Even accounting for these limitations, there is work available in the national economy that the claimant could perform.

> AR 35.

The ALJ added:

> While the claimant states his headaches and difficulty with focus relate back to a severe head injury he sustained as a toddler, the undersigned finds it noteworthy that, despite chronic headaches and difficulty with concentration and focus, the claimant never received

13

special education and "generally received good grades throughout his academic career . . .made honor roll at times." The undersigned also notes that claimant stated that his increase in pain coincided with several situational stressors, including his mother's cancer diagnosis and the breakdown of his marriage, and pain was worse when he is "particularly stressed." Although the claimant rated his pain at a 15 out of ten during the March 2013 evaluation with Dr. Bauer, he "remained engaged in the testing process throughout the examination" despite [h]is report of significant pain. Furthermore, while claimant suffers from fibromyalgia, there is no evidence that he is under the care of a rheumatologist or other provider specializing in the treatment of chronic myofascial pain. In fact, the only consistent treatment appears to be from Dr. Saxon, a neurologist.

AR 35 (citations to administrative record omitted).

The ALJ gave some weight to the opinion of consultant Dr. Rush, which observed that although Plaintiff complained of headaches and widespread joint pain, the physical examination was entirely normal. AR 32. Although Dr. Rush diagnosed Plaintiff with "chronic pain syndrome with diagnoses of fibromyalgia and neck and back problems, "posttraumatic headaches with normal mental status," "history of depression, on antidepressants," and "gastritis, chronic on medications," "Dr. Rush commented that imaging did not show any significant abnormalities, and the claimant demonstrated full range of motion in the spine with negative leg raises." AR 32. As a result, Dr. Rush concluded that Plaintiff had no physical work restrictions. AR 32. Thereafter, state agency medical consultants reviewed the record, including Dr. Rush's consultative opinion, and agreed that Plaintiff had no work-related physical restrictions but added some restrictions on exposure to work hazards. AR 32.

The ALJ disagreed with Dr. Rush and the agency physicians because imaging and objective observations in the record supported a finding of work-related physical restriction due to Plaintiff's neck and back pain, and headaches. AR 33. He concluded that in view of Plaintiff's subjective representations of his pain, his residual functional capacity was limited to work at a medium level with additional restrictions on postural activities and on the environmental features that aggravated Plaintiff's headaches. AR 33.

The ALJ gave minimal weight to Dr. Saxon's medical source statement opining that Plaintiff was capable of no more than "an extremely narrow range of sedentary work." AR 33. The ALJ found the opinion, set forth on a check-box form, to be inconsistent with Dr. Saxton's

treatment notes, particularly repeated findings that Plaintiff's cranial nerve exams were essentially normal and that Plaintiff had full motor strength despite cervical muscle spasms. AR 33. The ALJ also noted that Plaintiff's follow-up appointments with Dr. Saxon, spaced from four to 20 weeks apart, were consistent with stable symptomology. AR 33.

The ALJ gave no weight to Dr. Garabedian's short-term work excuse notes, finding that the chiropractor's treatment notes included no objective findings to support a conclusion that Plaintiff was unable to work. AR 33.

After summarizing the findings of the psychological consultant Dr. Martin, the ALJ relied on Dr. Martin's opinion that Plaintiff was able to perform simple tasks. AR 33-34. "[T]he claimant's anxiety and depressed mood due to stress does not prevent him from performing a range of daily tasks, and there are no treatment notes from a mental health provider to suggest that he is more limited mentally than found in the residual functional capacity." AR 34.

The ALJ gave little weight to the opinions of the agency psychological consultants, Drs. Davis and Loomis, both of whom opined that Plaintiff did not have a severe mental impairment. AR 34. The ALJ found that treatment records "provided some support for the claimant's allegations of ongoing cognitive difficulties, depression, and anxiety symptoms due to situational stress." AR 34.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. He properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity. *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999). Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions);

*Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

The Court is not required to accept Plaintiff's characterization of his treatment records or his assessment of the medical opinions. The ALJ fully supported his determination based on multiple medical opinions and the evidence of record. Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

## IX.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff William David Bitler, Jr.


IT IS SO ORDERED.

Dated:    __February 26, 2020__              _____/s/ Gary S. Austin_____
                                                                  UNITED STATES MAGISTRATE JUDGE